## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| **TIMOTHY L. JENKINS** )<br>**4200 MASSACHUSETTS AVE. NW** )<br>**WASHINGTON, DC 20016** )<br>)<br>**ALTA JEANNETTE CANNADAY** )<br>**3313 HAMPTON POINT DR. APT. B** )<br>**COLESVILLE, MD 20904** )<br>)<br>**WILLIAM VALENTINE KEENE** )<br>**19135 US HIGHWAY 19 N. #J28** )<br>**CLEARWATER, FL 33764** )<br>)<br>**STEPHEN D. JACKSON** )<br>**29 MERRIL PLACE** )<br>**INWOOD, NY 11096** )<br>)<br>**MARIA P. JONES** )<br>**2211 DOUGLAS ST. NE** )<br>**WASHINGTON, DC 20018** )<br>)<br>**WILLIE-LLOYD REEVES** )<br>**1250 4TH ST. SW #W406** )<br>**WASHINGTON, DC 20024** )<br>)<br>**APRIL R. SILVER** )<br>**297 OCEAN AVENUE #3D** )<br>**BROOKLYN, NY 11225** )<br>)<br>**DAANEN STRACHAN, PH.D.** )<br>**3196 WESTOVER DR. SE** )<br>**WASHINGTON, DC 20020** )<br>)<br>**SOWANDE S. TICHAWONNA** )<br>**1320 WEBSTER ST. NE** )<br>**WASHINGTON, DC 20017** )<br>)<br>**ANGELA R. TRAPP** )<br>**105 WILMINGTON PLACE** )<br>**TYRONE, GA 30290** )<br>          **PLAINTIFFS,** )<br>)<br>**V.** )<br>) | **CASE NO: 2021 CA 004729B**<br>**JUDGE JULIET MCKENNA**<br>**NEXT COURT DATE: MARCH 26, 2022**<br>**INITIAL CONFERENCE** |

|  |  |
|---|---|
| HOWARD UNIVERSITY, INC. | ) |
| 2400 6TH STREET NW | ) |
| WASHINGTON, DC  20059 | ) |
|  | ) |
| AND | ) |
|  | ) |
| TRUSTEES OF ITS BOARD OF TRUSTEES | ) |
| AND THE HOWARD UNIVERSITY | ) |
| BOARD OF TRUSTEES C/O | ) |
| SECRETARY OF THE BOARD | ) |
| 2400 6TH ST. NW | ) |
| WASHINGTON, DC  20059 | ) |
|  | ) |
| DEFENDANTS. | ) |
|  | ) |

## AMENDED COMPLAINT[1]

COME NOW Plaintiffs, Timothy L. Jenkins, Esq., Willie Lloyd Reeves, Esq., William "Damani" Keene, Alta Jeannette Cannaday, April R. Silver, Stephen D. Jackson, Maria P. Jones, Daanen Strachan, Ph.D., Sowande S. Tichawonna and Angela R. Trapp, by and through undersigned counsel and respectfully file this Complaint against Howard University, the Trustees on the Howard University Board of Trustees ("BOT") in office, and the Board of Trustees pursuant to their respective violations of applicable Howard University Board of Trustee by-laws. These violations resulted in the BOT's illegal exclusion of certain affiliate Trustees from election to its Board, which effectively deprived it of its required complete membership for seventeen (17) months, beginning June 2020 through November 2021.

Counter-intuitive to its fiduciary obligations and stated principles of shared governance, the BOT carefully developed and implemented a course of conduct designed first to temporarily freeze the election process beginning in April 2020, and then in November 2021, to permanently

---

[1] /All exhibits referenced herein are attached to the Complaint and incorporated by reference.

exclude affiliate Trustees (alumni, students, and faculty from its Board) by amending its by-laws without affiliate trustee members enjoying the right to participate in that process. As a result, more than 80,000 alumni have been effectively disenfranchised from its longstanding role in electing independent alumni to the BOT. Additionally, the Board's present by-laws contains a provision which, as a matter of law, precludes scrutiny of its dutiful exercise of its fiduciary duties, to wit, its minutes of its meetings are not released for twenty-five (25) years, one quarter of a century. This extraordinary absence of transparency precludes any assessment by its stakeholders or other interested persons regarding its compliance with its fiduciary duties, including scrutiny of potential conflicts of interest and/or ethical considerations. The immediate civil action presents the sole means by which Howard University alumni can remedy the University's violations of its governing rules and correct the illegal way it has disenfranchised affiliate trustees, and alumni, from a shared role in its governance and ultimately, to maximize the Board's transparency and accountability.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction to hear this matter under D.C. Code §§ 11-921. As to venue, the actions herein occurred in the District of Columbia.

## PARTIES [2]

---

[2]/The Howard University Alumni Association ("HUAA"), which might appear to be the vehicle through which to bring the immediate lawsuit, is neither separate nor independent from the University and simply stated, the University would have to authorize its actions to essentially sue itself. HUAA enjoys the same tax identification number as the University. It is organized and operated as an entity regulated by the University's Department of Development and Alumni Affairs. Its elections are subject to oversight and control of the University's Board of Trustees. Its Constitution, at Article X, Section 1, requires the Association to submit proposed nominations and election procedures to the Board of Trustees for approval not later than January 31 of the year in which an election is to be held. Its nomination and election procedures are required to comply with University By-laws and the policies and procedures established by the Board of Trustees as may be amended. To the extent that the BOT controls and informs HUAA's governance, including its budget, and HUAA is an arm of the University, it is compromised in its ability to challenge the BOT's s actions, as here in other words, to sue itself. As a result, despite urgings from concerned alumni, at no time did HUAA challenge, legally or otherwise, the BOT's refusal to fill affiliate trustee positions between April 6, 2020, and November 5, 2021. Nor was this issue brought to Alumni attention or presented by HUAA to alumni at large for discussion and debate at any point during this stated period.

2. Plaintiff Timothy L. Jenkins, Esq. is a Howard University (hereafter "Howard" or "HU") Alumnus, Class of 1960, former student body president, former member of the HU Board of Trustees, former Special Counsel to HU during the presidency of the late Dr. James E. Cheek, a co-founder of SNCC, and a resident of the District of Columbia.

3. Plaintiff Willie-Lloyd Reeves, Esq. is an HU Alumnus, Class of 1971, Liberal Arts, Class of 1974 School of Law, and a former student leader in both the undergraduate and law schools. He is a resident of the District of Columbia.

4. Plaintiff William "Damani" Keene is an HU Alumnus, Class of 1966, a former career employee/administrator of HU having served as Dean of Residence Life, Special Assistant to the VP for Student Affairs, Acting Director of Blackburn University Center, and Associate Director of Student Activities. He is also a former Alumni Trustee member of the HU Board of Trustees. He is a resident of Clearwater, Florida.

5. Plaintiff April R. Silver is an HU Alumna, Class of 1991, BA Liberal Arts, former President of the Howard University Student Association ("HUSA"), and co-leader of the 1989 Howard University student protest. She is a resident of Brooklyn, New York.

6. Plaintiff Maria P. Jones is an HU Alumna, Class of 1988, BA School of Communications, and a resident of the District of Columbia.

7. Plaintiff Sowande S. Tichawonna is an HU Alumnus, Class of 1985, BA Communications. He is a resident of the District of Columbia. In 2018, was nominated by Maria Jones to the Board for purpose of being placed on the ballot for elected Alumni positions. Inexplicably, his name never appeared on that 2018 ballot.

8. Plaintiff Angela R. Trapp is an HU Alumna, Class of 1994, BSEE Engineering.  She has held several leadership positions in the Howard University Alumni Association (hereafter "HUAA").  She is a resident of Tyrone, Georgia.

9. Plaintiff, Daanen Strachan, Ph. D, is an HU Alumnus, Class of 1988, BS Liberal Arts. He is a former student leader.  He is a former career employee/administrator of HU having served as Associate Director of Student Activities and resident of the District of Columbia.

10. Plaintiff Alta Jeannette Cannaday is an HU Alumna, Class of 1991, BS Liberal Arts. She has served in various capacities in HUAA.  She is a resident of Silver Spring, MD.

11. Plaintiff Stephen D. Jackson is an HU Alumnus, Class of 1986, BS Liberal Arts, and a former student leader. He is a resident of Inwood, New York.

12. Defendant Howard University is a federally chartered and funded non-profit educational institution originally organized by an Act of the United States Congress. It received its tax-exempt non-profit status in 1940 and is subject to District of Columbia Non-Profit laws.

13. Defendant, Howard University's Board of Trustees (hereafter "BOT" or "Board") is Howard's governing body and is governed by a set of by-laws last amended on November 5, 2021. At all times referenced herein, Plaintiffs assert that Defendants' 2018 by-laws govern its actions herein, and that its November 2021 amendment only a few months ago of its by-laws, as well as its recent BOT appointments are void *ab initio* and/or *ultra vires*.

14. Defendant Howard University Board Members are hereby being sued in their official capacities.  These members include:  Laurence C. Morse, Chairman; Ms. Leslie D. Hale, Vice-Chair; Mark A. L. Mason; Minnie Baylor-Henry, Esq.; Dr. Charles Boyd; Mr. Chris Carr;  Donald B. Christian, CPA, CISA; Mr. Godfrey Gill; Dr. Richard Goodman; the

Honorable Marie C. Johns; Jill B. Louis, Esq.; Mr. James J. Murren; Hillary Rosen; Dr. Reed Tuckson; Chris Washington; Dr. Danette G. Howard; The Honorable Alphonso Jackson; The Honorable Ronald Rosenfeld; Shelly Stewart, Jr., and Benaree P. Wiley.

## FACTUAL BACKGROUND

### HISTORY OF SHARED GOVERNANCE AT HOWARD UNIVERSITY

15. Howard University enjoys a rich history of shared governance, a concept that involves University stakeholder (alumni, students, and faculty) participation in the University's governance process. Alumni trustees have been on Howard's BOT since 1926. Student trustees have served since 1970.

16. For nearly 100 years, alumni trustees, *elected by alumni*, have been an invaluable asset to the University's highly promoted principle of "shared governance."

17. On April 8, 1926, a bill known as H.R. 11112 to amend section 4 of the Act of Incorporation of Howard University, which appears to be the first historical reference to Alumni representation on the BOT, introduced in the United States House of Representatives, read as follows:

> The government of Howard University shall be vested in a board of trustees, not less than eighteen in number, to be appointed and elected as follows: one-third appointed by the Commissioner of Education, one-third elected by a mail ballot of the alumni of the University under alumni auspices, and these two-thirds thus appointed and elected shall at their first meeting elect by a written ballot one-third additional trustees to complete the required number of not less than eighteen trustees: provided, that each group shall be appointed and elected so as to have the terms of each group expire one-third in one year, one-third in two years, and one-third in three years. After the first election the term of service of each trustee thereafter elected or appointed shall be for three years." [3]

---

[3] / "A History of the Federal Appropriation of Howard University 1867-1926" at 7. Although that amendment did not pass, the BOT in that same year initiated a process for alumni to nominate Board trustees to ensure shared governance at the university's highest level. That year coincided with Mordecai Johnson becoming Howard's first African American President.

18. On October 31, 1969, after an extraordinary 1968 student protest seeking enhanced BOT transparency and accountability, the Board considered its students' request for Trustee membership. At this meeting, then President of Howard, the late Dr. James Cheek, stated

> "…. *that prior structures and forms which evolved over the years to govern American institutions of higher learning were no longer appropriate. The University is a community and that to protect this concept, all aspects of the community must be active participants in the decision-making apparatus of the institution.*" (Emphasis added)

19. In 1970, the BOT voted to add elected student and faculty to its membership as affiliate trustees.  See Board of Trustees by-laws at Article I, Sections 2.

20. The importance of these affiliate trustees has been addressed in multiple studies.  An October 1974, Arthur D. Little, Inc. report, titled Comprehensive Study of the University's Governance and Management, to the University ("1974 Report") specifically embraced a governance structure which included affiliate trustees when it recommended the following regarding policy formulation: "….we suggest that student and faculty participation in actual policy formulation be focused where it is now, in the hands of elected student and faculty Trustees acting as equals with the other Trustees on the Board."

21. The 1974 Report further noted that with the addition of faculty and student trustees, the Board now adequately represented the concerns of the University's internal constituencies.  Finally, it was noted that Board policy prohibited any Trustee from functioning as an advocate of a special interest group or constituency.  Thus, there was an inherent control on subjective advocacy.

### HOWARD'S MARCH 2020 ACCREDITATION SELF-STUDY

22. In March 2020, the University completed a Self-Study ("hereafter "Study") for submission to the Middle States Commission on Higher Education.  The 2020 Study, as did an earlier 2009 Self-Study, reviewed Howard's governance structure, and underscored its tradition

of shared authority and responsibility, including the election of students and faculty to its Board.  Howard promoted shared governance in that Report as follows: the "adherence to shared governance invites the voices of internal constituents in key decisions, noting that its governing structure incorporates policies that directly support its stated mission and core values."

23. The Study on page 100 reiterated this point:

> *Howard University embraces the concept of shared governance; its leadership has been deliberate about including all stakeholders in major decision-making* (e.g., faculty members play large and critically important roles on four task forces of paramount importance concerning the direction of the university: Strategic Plan 2019-2024, Academic and Administrative Program Prioritization Task Force, Budget Advisory Committee, and Middle States self-study).  (Emphasis added)

24.  One key finding in that 2020 Study was that "*Howard University's leadership had been deliberate about including all stakeholders in major decision-making."* (Emphasis added).

25. The presence of affiliate trustees on Howard's BOT is a sacred space for university stakeholders who support and respect the University's unique history, as an educational center expressly developed immediately after the Civil War to meet the great educational need of previously enslaved Americans of African descent. The BOT's decision to amend applicable by-laws to erase time honored shared governance principles naturally caused great consternation among the affected stakeholders. Each constituent group raised serious concerns about the way the BOT executed the usurpation of their rights and thwarted shared governance's storied history.  Repeated efforts were made after the BOT's succinct announcement to obtain the basic information upon which the BOT relied and the applicable process in which it decided to disenfranchise affiliate trustees. Its response was minimal, insensitive, and token in nature. Given its November 5, 2021, vote to permanently exclude affiliate trustees, no recourse exists outside of the BOT itself to ensure

transparency and its compliance with its own by-laws other than through a court of law. Absent this court's review there exists no other forum in which thousands of affected alumni can ensure the legality of the BOT's actions.

## THE NATURE OF THE ALUMNI-BOT DISPUTE

26. By-laws are legally enforceable contracts that outline how the Board will operate its affairs These rules govern the way a Board itself reviews its own actions. Howard's  amended 2018 by-laws govern the civil dispute here, which dispute consists of the following: 1) the Board's Governance Committee's April 6, 2020 freeze of the nomination, election, and seating of affiliate trustees on the BOT under the emergency pretense of COVID, thereby immediately precluding faculty, students, and alumni trustee membership except for then seated affiliate trustees;  2) the Board's subsequent June 2021 vote, 14 months later without the excluded, but required affiliate trustee membership being seated on the BOT; 3) the Board's  November 5, 2021 vote to amend Article 1, Section 2 of the by-laws to exclude affiliate trustees without the excluded, but required affiliate trustee membership being seated on the BOT.  The BOT's Governance Committee's April 6, 2020 "recommendation" effectively struck affiliate trustees from the Board between June 2020 and November 2021, for approximately 18 months.

27. Resultantly, Howard Alumni in their entirety, which includes Plaintiffs, have been injured via their disenfranchisement at the highest level of the University's governance; they have lost the right to Board membership, and the right to participate in the selection Alumni membership on the Howard University BOT, with all attending Board membership notice, voting rights, and privileges. More than 2,500 alumni have signed a petition to the BOT to reinstate elected affiliate trustee Stakeholders.

## APPLICABLE BY-LAWS

28. The following By-law provisions are implicated by the BOT's actions beginning in April

2020 through November 2021:

### ARTICLE I BOARD MEMBERSHIP

SECTION 2: Membership on the Board.

The number of Trustees shall be up to 35, unless otherwise specified by recommendation of the Governance Committee, for a specific period of time, and by majority vote of the full Board. ***Of such number, three shall be designated as Alumni Trustees, two as Faculty Trustees, and two as Student Trustees. ….*** (Emphasis added)

SECTION 4: Action without Formal Meeting.

Any action required or permitted to be taken by the Board or by any Committee thereof may be taken without a formal meeting*, if a majority of the Trustees entitled to vote approve* the action in writing, fax, electronic mail, website voting or other record. The Secretary shall prepare and maintain a record of the action and the individual approvals of the Members of the Board or of a Committee and shall file the same with the minutes of the proceedings of the Board or the Committee.

SECTION 5: Board Action.

The affirmative vote of a majority of the Trustees presents at a meeting of the Board, or at any Committee thereof, at which a quorum is present shall be required for any action of the Board, or of such Committee, unless the vote of a greater number of Trustees is required by a statute, the University Charter, or by these Bylaws:
….

SECTION 6: Quorum.

Except as otherwise provided in these Bylaws, one-third of the membership of the Trustees, or of a Committee thereof, shall constitute a quorum for any meeting of the Board or of such Committee, except that a majority shall be necessary to establish a quorum of the Executive Committee when such Committee is acting for the entire Board. …

SECTION 7: Terms of Office for Trustees

(a) General Rule -- Trustees shall be elected by the Board of Trustees at any regular or special Meeting of the Board, *provided that the notice required for such meeting advises the Trustees of such election.* The term of Office

10

of a Trustee shall begin on the first day of the month next following the month in which the Trustee was elected. Except as provided for in subsection (c) of this Section 7 with respect to the term of Office applicable to Alumni, Faculty, and Student Trustees, and except with respect to the President (who shall remain a Trustee for his or her entire term as President of the University):

….

SECTION 8. Nomination and Election of Trustees.

Affiliate trustees *are nominated via a process by their respective constituents*, however, election to the Board is the exclusive authority of the Board of Trustees. The number and term of affiliate trustees shall be as provided for in this subsection (c).  (Emphasis added).

(i) *Alumni Trustees – The three Alumni Trustees shall be elected for terms of three years each. Such terms shall be staggered so that one such term expires each year. An individual shall be eligible to serve only two consecutive terms as an Alumni Trustee.*

(ii) Faculty Trustees – *The two Faculty Trustees shall be elected for terms of three years each. S*uch terms shall be staggered, in a manner deemed appropriate by the Board, so that both terms do not expire during the same year. An individual shall be eligible to serve only two consecutive terms as a Faculty Trustee.

(iii) Student Trustees – The two Student Trustees shall be elected for terms of one year each. Student Trustees shall be eligible to serve no more than one term as a Student Trustee.

**ARTICLE II: BOARD MEETINGS**

SECTION 1: Regular Meetings.

(a) Dates -- There shall be at least three Regular Meetings of the Board of Trustees each year, one of which shall be designated as the Annual Meeting of the Board. Regular Meetings shall take place at such time and locations as may be established from time-to-time by the Board.

Notice -- Notice of the time and place of Regular Meetings *shall be sent to all Members of the Board* upon adoption of the Regular Meeting scheduled by the Board and at least 30 days prior to each such meeting. (Emphasis added).

SECTION 5: Board Action.

11

The affirmative vote of a majority of the Trustees presents at a meeting of the Board, or at any Committee thereof, at which a quorum is present shall be required for any action of the Board, or of such Committee, unless the vote of a greater number of Trustees is required by a statute, the University Charter, or by these by-laws…

SECTION 6: Quorum.

Except as otherwise provided in these Bylaws, one-third of the membership of the Trustees, or of a Committee thereof, shall constitute a quorum for any meeting of the Board or of such Committee, except that a majority shall be necessary to establish a quorum of the Executive Committee when such Committee is acting for the entire Board….

### ARTICLE VIII.  AMENDMENTS

*These by-laws may be amended by the affirmative vote of three-fourths of the members present, provided, that **one half of the total membership of the Board is present and notice of the proposed amendment has been given to each member of the Board at least 30 days before the meeting**.*   (Emphasis added)

### THE BOT'S IMPROPER CONSOLIDATION OF POWER AND AUTHORITY

29. In recent years Howard's embrace of shared governance, coupled with societal interest in social and racial justice, the election of Kamala Harris to the Vice-Presidency, and the achievement of other celebrated alumni, has led to increased philanthropic support.

30. Instead of maximizing an opportunity to strengthen University-stakeholder relationships in its often-stated support for shared governance, the University and the BOT disenfranchised and minimized expressions of unique, valued, and diverse views in its governance process, which means here the right to vote, per its own Bylaws.

31. The current ultra vires action at issue is not the first recent instance of the BOT violating its by-laws.  Beginning in January 2015, the BOT decided to scrutinize affiliate trustees selected by their respective constituencies to sit on the BOT.  Its action at that time violated its by-laws and was repealed on April 18, 2015. In September 2015, the BOT reinstituted

its vetting decision, thereby qualifying (by pre-clearance) stakeholder selections of candidates elected by their membership to the BOT.

32.  On October 23, 2018, the BOT seated two (2) newly elected affiliate trustees:  An alumni trustee and an undergraduate student trustee: but it did not seat the undergraduate faculty trustee. It also appointed one (1) General Trustee.

33. On November 13, 2019, one year later, the BOT seated three (3) new affiliate trustee members: an alumni trustee, and the undergraduate and graduate student trustees; it also appointed an additional general trustee.

34. Between January and February 2020, the University sought nominations from alumni to fill a then vacant alumni trustee position.  The elected alumni trustees at that time were Eugene "Rock" Newman and Jill B. Louis.  Mr. Newman's term expired in June 2020 and Ms. Louis's term expired in June 2021. Subject to the Governance Committee's suspension of the affiliate trustee elections in April 2020, no affiliate trustee elections occurred between June 2020 and June 2021; consistent therewith the BOT did not fill these two (2) alumni seats.   See Ex. 1 (Chart depicting affiliate trustee vacancy status).

35. Chris Washington, the most recently elected alumni trustee, remains the sole alumni trustee on the Board; his term expires in 2022.

**THE GOVERNANCE COMMITTEE'S APRIL 6, 2020 DECISIONS**

36.  On April 6, 2020, approximately one month after the University completed its March 2020 Self-Study, in which it touted its commitment to "Shared Governance for accreditation purposes, the BOT's Governance Committee notified "the Howard University Community" that it was freezing the affiliate Trustee nomination, election, and BOT seating process due to the COVID-19 pandemic. Without reference to any By-law

provision authorizing the Committee Chairperson's singular shut down of the Howard affiliate trustee elections, that correspondence stated as follows:

> As you know, the country is in a midst of an unprecedented global public health crisis as a result of the COVID-19 pandemic. Among the unprecedented actions the University has taken in response is the evacuation of the campus, except for essential personnel, and the migration of all classroom instruction to a remote learning platform. The Board of Trustees has been engaged as these decisions were made for the health and safety of every member of the Howard Community and the surrounding neighborhood….
>
> While these considerations are underway and given the urgent business at hand in addressing COVID-19, the Committee has asked the Board of Trustees to pause on adding any new Board members including via elections for affiliate trustees. These deliberations will take into account how to assure that our critical stakeholders can make the most positive contributions towards university governance, as well as how the Board of Trustees should benefit from the most diverse and comprehensive experiences and views available.
>
> The Governance Committee has notified the Office of Alumni Relations on behalf of the alumni trustee election and the Faculty Senate Committee on behalf of the faculty trustee election of *this decision. In addition, the Governance Committee will not recommend any new general trustees for election to the Board until further notice.* (The Board values the input of all University stakeholders and is committed to engaging the current elected leaders of the Howard University Student Association (HUSA), the Howard University Alumni Association (HUAA), the Faculty Senate and the Howard University Staff Organization (HUSO) as they continue the stewardship of the University through this very difficult period. See Ex. 2.

37. The Howard University President admitted to Alumni in an "interview" (via an "Alumni Insight" Zoom session) in January 2022 that the "Governance Committee" Chair independently decided to suspend elections between April 2020 and November 2021. No further action was taken by the Board during that period regarding board elections consistent with the Governance Committee's decision.

38. There is no provision in the applicable 2018 by-laws that authorizes the BOT to suspend its by-laws for emergency reasons such as COVID. Moreover, BOT meetings commenced after April 6, 2020, virtually in "business as usual" mode. No such "further notice" came

from the Governance Committee.   Nor did the BOT take any steps thereafter to duly constitute the affiliate trustee nomination/election process in accordance with its applicable by-laws.

39. Albeit the Governance Committee's actions characterized its June 2020 freeze of affiliate trustee elections as a "recommendation," President Frederick recently publicly admitted an a January, 2022 speech to Alumni that the Governance Committee instituted this action; further that it constituted a "decision", not a recommendation.   That decision, which was not voted upon by the full Board, effectively violated Article 1, Section 2.  This provision required the BOT to seat affiliate trustees as full members and to follow the process outlined in Article I, Sections 7 and 8 to ensure as much.   Once seated as full board members, as required by the by-laws, affiliate trustees enjoyed the same exact rights as other BOT members to participate and to vote in the Board's June and November 2021 meetings at which the BOT voted to eliminate their membership on the Board.

40. The Governance Committee effectively prohibited the required affiliate trustee membership from being elected and seated on the BOT between April 6, 2020, and November 5. 2021, except that then-seated affiliate trustees were allowed to complete their terms.  This did not cure the University's violation of its by-laws.

41. Absent a Board-approved resolution or by-law amendment, the BOT's Governance Committee illegally disenfranchised Plaintiffs and thousands of other alumni stakeholders, who then enjoyed the right, as alumni, to nominate and to vote for affiliate alumni trustees between June 2020 and June 2021. Each vote taken by the BOT to exclude affiliate trustees was illegal and violated the University's by-laws.

## THE BOT'S DELIBERATE STRATEGIC EXCLUSION OF AFFILIATE TRUSTEES

42. Despite the University's March 2020 Self-study's promotion of shared governance, in April 2020, the BOT's Governance Committee froze the nominations/elections/seating of affiliate trustees.

43. On June 14, 2021, the BOT Chairman formally announced that it had voted "unanimously" to eliminate affiliate trustee membership positions.    Both the Board's October and November 2021 votes to exclude affiliate trustees after it froze the election of affiliate trustees, except those then seated   Exhibit 3.  The by-laws requited that the BOT to seat all affiliate trustee members. Once seated as required by not later than October 1, 2020,   as duly required full board members, these elected affiliate trustees were requited to have equally received notice of all 2021 board meetings, notice of any and all proposed by-law amendments, enjoyed the equal right as full BOT members vote on these proposed changes and all other BOT business matters, including approval of the bond issues that followed their exclusion.

44.  As of June 2021, only one affiliate trustee, Chris Washington, remained on the BOT.  See Ex. 1.

45. When the BOT votes on an issue affecting governance, its Secretary formally notifies the Howard University student, alumni, and faculty representatives regarding its action(s). Exhibit 4.  No such notice exists regarding a Board vote between April 6, 2020, and the present memorializing its approval of the Governance Committee's April 6, 2020, action. Further, President Frederick has confirmed the Governance Committee's actions.

46. On November 5, 2021, the Board voted upon a recommendation from its Audit and Legal Committee to amend Article I, Section 2.  Exhibit 4.

47.  For the prior 17 months, the Board illegally excluded affiliate trustees from serving as full BOT members.  In accordance with its by-laws, the BOT should have facilitated their elections and seated them well before the July before the November 2021 BOT meetings, ensured that they received proper notice of those meetings, and preserved their legally required membership and enfranchisement. It did not.

48. Between June 2020 and June 2021 at least five (5) affiliate trustee positions, which BOT by-laws required to be seated, remained vacant.

49. The term of one (1) of the two (2) remaining alumni affiliate trustee expired one year later in approximately June 2021, leaving six (6) affiliate trustee vacancies, including two (2) alumni members.

50. After the University's completion of its' Self-study and the Governance Committee's April 2020 decision, the Board retained the consulting services of Independent Educational Services (hereafter "the Consultant" or "IES") reportedly to study the value and need for shared governance at Howard University.  Despite requests, no information about that study, including a summary of its findings, was presented to concerned Alumni. Nor it has ted requests, nor to the Howard University Alumni Association.

### BOARD VIOLATIONS OF ITS BY-LAWS

51. According to its by-laws, in April 2020 the Governance Committee lacked the authority to singularly freeze affiliate trustee nominations and elections, i.e. to not fill their full membership board positions.  There is no provision in the by-laws for the suspension of membership on the BOT in purportedly emergency situations such as COVID.

52. While the Governance Committee's April 6, 2020 correspondence claimed that it and/or the BOT were considering alternative ways for affiliate trustees to "make positive

contributions to University governance," it disingenuously omitted its true intention: the full and complete disenfranchisement of affiliate trustee board members.

53. The Governance Committee's decision violated University by-laws. It required an appropriate amendment of Article II, Section 8 in accordance with Article VIII's required notice to the entire BOT, including the excluded affiliate trustee members.

54. At the expiration of respective affiliate trustee terms, applicable by-laws at Article I, sections 7 and 8, required stakeholder nominations and elections to be held to fill those specific seats to comply with the by-law membership requirement at Article I, Section 2.

55. Six (6) unfilled affiliate trustee positions should have been seated as of the BOT's June and November 2021 meetings. Exhibit 1.[4]

56. The BOT's refusal to seat affiliate trustee members (alumni, students, and faculty) between June 2020 and November 2021 precluded it from effectuating its required Board membership and notice(s) to all rightful Board members during that time. This illegal act rendered the BOT's June and November 5, 2021 votes to remove affiliate Trustees and amend its by-laws at Article I, Section 2 *ultra vires*.

57. No specific details have been disclosed to alumni regarding the substantive details of the Board's June 2021 vote, except that it was "unanimous" and that the BOT relied upon the finding(s) of the IES consultants. Despite repeated requests from concerned Alumni, the BOT has consistently refused to disclose copies of the final IES findings, a summary thereof, or BOT minutes regarding its June 2021 vote.

58. Between April 20, 2020, and June 23, 2021, there was little communication from the BOT with Howard alumni regarding the fact of the IES consultation and role. The BOT has

---

[4]/ During the period when it excluded affiliate trustee membership, the BOT engaged in several large bond offerings (in 2020 and 2021 during Covid that would have required the approval of the full board.

refused to reverse its June 2021 and November 2021 votes, in which it illegally amended its by-laws and permanently excluded affiliate trustees.

### THE BOARD CHAIRMAN'S JUNE 2021 ANNOUNCEMENT

59. In July, 2021, fourteen (14) months after the April 6, 2020 Governance Committee freeze of affiliate trustee nominations and elections, Board Chairman Lawrence Morse (hereafter "Morse") announced that the BOT *unanimously* changed the Board's governance structure. It did not at that time amend its by-laws.  The Board's July 13, 2021, announcement indicated its June 11, 2021 approval of Board Officer *Election* Results and recommendation for approval of the "Governance Recommendation on Board Restructuring," Ex. 3. At the exact time that the Governance Committee froze affiliate trustee elections it was developing and finalizing its recommendations to remove them from the Board, the antithesis of transparency and good faith.

60. Chairman Morse nevertheless stated in his remarks that since 2020 the BOT had engaged in the process of evaluating best practices for boards and that it used the services of IES, an external consulting firm with a specialization in higher education board governance, to assist with this process.  No date was given as to when the BOT retained IES; nor did the Chairman disclose the consultant's written findings or a summary thereof.

61. Chairman Morse also stated that certain alumni and students would prospectively serve on BOT committees at the pleasure of the BOT.  They would, however, no longer enjoy full trustee status, which included voting rights.

62. The BOT's actions implicate the specific meeting notices which given to BOT members for its June and November 2021 Board meetings, particularly the latter meeting notice

regarding amending its by-laws.   These notices are required to be communicated to the full BOT and to comply with Article 8.

63. According to Article I, Sections 2, 7 and 8, all Howard University students, faculty, and alumni "shall" be included among the BOT's membership.  Absent an amendment to the by-laws, the BOT did not have the authority to exclude affiliate trustees from being elected to the BOT with all attending notice rights between June, 2020 and November 5, 2021.

64. The BOT ignored its by-laws, minimized its shared governance mandate, and disenfranchised affiliate trustees.

### THE BOARD'S ILLEGAL EXCLUSION OF AFFILIATE TRUSTEES

65. There was no valid and legitimate BOT vote whatsoever on the Governance Committee's April 2020 decision to freeze elections and effectively remove affiliate trustee positions from the BOT.  Absent BOT membership, the notice provided was not effectuated to the legally required full BOT membership pertinent to the June 11 and November 5, 2021 BOT meetings.

66. The effective exclusion of elected affiliate trustee members from participation as full board members since June 2020 renders all Board actions since then *ultra vires*.

### ALUMNI DEMANDS FOR BOARD TRANSPARENCY AND ACCOUNTABILITY

67.  Before filing this action, Plaintiffs, among others, attempted unsuccessfully to amicably resolve this matter with university leadership by directly communicating their concerns to the BOT.

68. On or about June 25, 2021, ten (10) former graduate and undergraduate student trustees who served between 2008 and 2021 sent a letter to the BOT regarding its action.  These former BOT members stated as follows about the Board's June 2021 unanimous vote:

> We were founded in the midst of a social climate that rejected diversity in higher education, from the student body, to faculty, and even board membership.  The Board's recent decision seems to reject that history. Our founders endeavored to reject leading higher education models and to create a space where we could do things differently.   They recognized something that we are affirming today: "difference does not mean deficient.

They added:

> Furthermore, we are concerned about the context in which this "unanimous" vote took place – without student and faculty trustee participation.  As mentioned, nominees for the undergraduate and graduate student trustee position were elected during the spring 2020 elections. Neither student was granted the standard confirmatory interview with the Board's Governance Committee. Even throughout the 2020-2021 academic year, those students were still not granted an interview. As the Board pursued its governance review, no student or faculty trustee were present during the Board's confidential discussions on this matter.   Even consultation with former student trustees, in a separate forum, cannot substitute sitting, voting student trustees participating in the Board's deliberations and final vote.  More importantly, it is hard to escape the less-than-ideal optics of the board pushing this matter forward in the midst of a global pandemic when no student or faculty were on campus or were granted the opportunity to offer contemporaneous arguments.  Ex. 5.

69. The remainder of their letter highlighted the value that student trustees bring to the BOT and urged the BOT to reverse its decision.

70.  Various alumni urged the BOT Chairman, the President, and current and Emeritus Board members to reconsider the BOT's actions.  In July 2021 more than thirty-five (35) alumni from the classes of 1960 through 2020, all former student government leaders, including former affiliate trustees, over 15 lawyers, and several of the immediate plaintiffs, sent a collaborative seven-page letter to the BOT.  That letter articulated its forceful opposition to the BOT's June 2021 decision.  Ex.6.

71. The July 2021 letter reminded the BOT of the University's sacred history of "Shared Governance" from 1926 to the present, including the University's 2009 and 2020 Self-studies. A pertinent excerpt follows:

As noted earlier, shared governance has been a part of Howard University since 1926, with a significant expansion in 1970. Affiliate trustees representing alumni, faculty, and students have thus participated in the governance of the University during some of the University's most critical time periods. Their voices and points of view have helped to shape the present-day Howard University. We believe that a continuation of shared governance is critical in shaping the future of Howard University. The affiliate trustee structure ensures that alumni, faculty, and students will have a continued guaranteed voice in the development of the University's policies and procedures.

....

Based on the above, we request that the Board take action immediately to reverse its decision to eliminate affiliate trustees.

….

Consistent with the duty to inform stakeholders about the most important decision to impact them in recent years, we request and strongly urge that the Board produce the following documents as soon as possible:
1. The IES report.
2. The Board and committee minutes which cover the deliberations and the subsequent decision to eliminate affiliate trustees.
3. The Board Bylaws in effect at the time the decision was made to eliminate affiliate trustees; and
4. Any newly revised Board by-laws.

72. The Board tersely responded to this plea and offered a one-hour "listening session" with a "hard stop" at sixty (60) minutes, all the while indicating that it had no intention whatsoever of reconsidering its exclusion of affiliate trustees from the board vote. It further refused to honor the request to disclose the IES Report, BOT and Governance Committee minutes, and any newly revised by-laws. The one-hour meeting occurred and was abruptly ended by the University after sixty (60) minutes.

73. On October 15, 2021, former student government leaders sent a second letter to the BOT urging reconsideration of its June 2021 vote:

This letter is being sent as a follow-up to our letter to you dated July 15, 2021 (see attachment). The primary purpose of this letter is to request again that the Board of Trustees (the "Board") take immediate action to reverse its decision to eliminate affiliate trustees from membership on the Board. As we expressed in our initial

letter, shared governance has been a part of Howard University since the 1920s, and the voices and points of view of alumni, students, and faculty on the Board have helped to shape the present-day Howard University. We believe that a continuation of shared governance is critical in shaping the future of the University. Ex. 7.

74. The BOT never responded to the October 2021 letter.

75. Despite procedural infirmities of its disenfranchisement of affiliate trustee members and persistent stakeholder urgings for transparency and accountability, the BOT has stubbornly defended the violation of its governing by-laws to the detriments of thousands of Alumni. Its actions have left concerned alumni stakeholders, therefore, with no meaningful recourse but judicial intervention to compel BOT's compliance with its own rules of governance. If not, then the BOT would continue to commence its decision making in violation of its rules.

76. The Board's action also implicates Article 2, Section 7, which reads:

Confidential Records -- Unless otherwise approved by the Board, minutes, and other records of the Board, and of the Committees thereof, that are less than 25 years old are confidential and are closed for research purposes and public inspection. Upon request for an exception from an interested party for the release of any such minutes or records, or upon its own initiative, the Board may request the University Archivist to give an opinion on the legitimate research value or other academic interest that may be served by the release thereof.

77. Based upon this 25-year confidentiality provision, the Board, and only the Board polices and manages its levels of transparency pertinent to alumni stakeholders, potentially interested parties. This level of extremely lengthy confidentiality (quarter-century) precludes any external assessment whatsoever regarding the Board's adherence to its fiduciary duty obligations. A quarter-century of confidentiality is oxymoronic to transparency, governing statutes of limitation for potential breaches of fiduciary duty, such as here, and possible other illegal acts.

78. As a further example, this quarter-century confidentiality provision, in addition to shared governance concerns, presents substantial impediments to scrutiny that should be accorded to University investment dealings involving University assets in areas in which the Security Exchange Commission in June 2020 urged high alerts. The absence of interested party access to minutes for this extensive time period leaves no means by which the exercise of the BOT's exercise of fiduciary duties can be meaningfully monitored and enforced.

79. Standards of conduct for board directors, including university trustees, is governed by D.C. Code, Section 29-406. Plaintiffs submit that Defendants' violation of the by-laws constitutes a breach of their fiduciary duty.

<u>**CAUSES OF ACTION**</u>

**COUNT I: DECLARATORY JUDGMENT**

80. Plaintiffs incorporate by reference the substance of all the foregoing factual allegations.

81. This is an action, derivative in nature, for a declaratory judgment brought to determine questions of actual controversy between the parties and to terminate the controversy rooted in the alleged violations by the BOT of its by-laws which give rise to this proceeding.

82. From April 2020 through November 5, 2021, the BOT's membership should have included duly elected affiliate trustee members whose nomination and consideration for membership are required in accordance with Article I, Sections 2, 7, and 8, and Article 8**.**

83. Given the Governance Committee's illegal April 2020 freeze of affiliate trustee nomination/election processes, all votes subsequent thereto, in which these positions were unfilled, precluded proper notice to the entire BOT.

84. Defendant BOT's Governance Committee violated its then applicable 2018 by-laws when it decided in April 2020 to suspend filling five (5) affiliate trustee BOT vacancies and an additional Alumni Trustee vacancy after June 30, 2021.

85. The BOT's purported June 13 and November 5, 2021 votes did not include the required entire board membership, and were thus *ultra vires.*

86. As Howard University alumni who enjoyed voting rights for affiliate trustees in 2018, Plaintiffs have suffered harm by Defendants' unlawful actions including, but not limited to, deprivation of their rightful nominations, elections, and seating alumni on the BOT, and dilution of their voting representation in violation of Article I, Sections 2, 7, and 8 of the applicable 2018 by-laws.

87. The Board's by-laws provision instituting a quarter-century year seal of confidentiality precludes transparency and any opportunity otherwise for interested parties where appropriate, to assess and determine the Board's compliance with statutorily required fiduciary duties, including ethical obligations; a quarter-century of confidentiality is oxymoronic to the principles of transparency and public accountability that are peculiar to Howard University as a federally funded private non-profit university.

88. There exists, therefore, an actual controversy concerning justiciable issues between the Alumni Plaintiffs and the Defendants within the jurisdiction of this Court.

89. Plaintiffs are entitled to a judgment declaring its rights as Howard University Alumni regarding the Board's non-compliance with its by-laws and further, resolving the parties' legal relations, rights, and responsibilities.

## COUNT II: BREACH OF FIDUCIARY DUTY

90. Plaintiffs incorporate by reference the substance of all foregoing factual allegations in paragraph 1-89.

91. The BOT and board trustees owe a fiduciary duty to the University and is required to act in good faith consistent with said duty. As such, BOT members should have exercised careful, skillful, prudent, and diligent oversight of board decisions affecting all members, the election thereof, their voting rights, and appropriate board notices as would be exercised by a prudent individual acting in like capacities and familiar with such matters under like circumstances.

92. The BOT knew or should have known that pursuant to its by-laws the single committee Chairperson of its Governance Committee, and or that Committee was unauthorized to suspend the elections of then required affiliate Board Members, including Alumni, for nearly an 18- month period, on the pretext of COVID-19.

93. The BOT actions in June and November 2021 formally amending the by-laws and eliminating Alumni stakeholders occurred during COVID-19.  The Board met during COVID in 2020 on a number of matters. It voted to add new members after November 2021, which occurred during COVID-19 and the Omicron. It also voted on several bond transactions in 2020 and 2021 that required board approval – during Covid.

94. The BOT's sanctioning of the violation of its by-laws resulted in the inexcusable exclusion of required alumni, faculty, and student members from board membership and governance. During that same period, the Board facilitated a consolidation of power that was inconsistent with the by-laws' democratic provisions governing stakeholder membership.

95. The trustees' actions clearly violated then applicable by-laws. Its' preclusion of required members on the Board tainted its subsequent decision-making, including the unlawful elimination of these elected alumni, faculty, and student members.

96. When Alumni raised legitimate concerns regarding the BOTs' reversal of a 95-year practice by the aforementioned correspondence and over 2,500 petition signatures, instead of open transparent debate and discussion, the BOT intensified its chilling response toward dissent and meaningful engagement regarding its decision. Absent any vehicle in which to meaningfully engage university leadership beyond a sixty minute "hard stop" meeting, the richly diverse plaintiffs were left with no alternative but to file the immediate lawsuit.

97. Howard University's leadership expressly frowns on this public course of action. But, as demonstrated by its resistance to meaningful dissent and institutional disengagement with dissenting viewpoints, Defendants' governance system offers absolutely no objective, impartial internal vehicle, policy, or practice in which to otherwise ensure respect for its stakeholders' divergent voice, concerns, and interests, and its urging for transparency and accountability particularly on the BOT's removal of alumni trustees from the BOT after 95 years.

98. The secretive, clandestine, exclusive way in which the Board amended its by-laws at Article I, Section 2, and refused to provide a single document upon which it relied to do so, including the IES consultant report and applicable minutes, contradicts the University's promotion of shared governance and transparency. The greatest harm caused by the BOT's actions here is evident in its illegal November 2021 by-law amendment and removal of affiliate trustees after from the BOT in the aforementioned manner in which it did so. This, Plaintiffs submit, is central to the trustees' breach of their duty to the University.

WHEREFORE, Plaintiffs respectfully demand:

(a) That this Honorable Court issue an Order declaring that the April 2020 Governance Committee's decision and action halting the nomination/election/seating of affiliate trustee Board Members between April 6, 2020, and November 5, 2021, violated applicable by-laws at Article 1, Sections 2, 7, and 8, and Article VIII;

(b) That the BOT's June 2021 and November 5, 2021, votes which excluded affiliate trustees, and which amended Article I, Section 2, among other By-law provisions, be declared null and void and of no lawful effect; this includes the Board's November 5, 2021 amendment to the by-laws which removed elected affiliate trustees;

(c) That any election or decision regarding the filling of board seats after June 2020 through the present be deemed *void ab initio*;

(d) That all affiliate trustee positions entitled to have been nominated, elected, and seated between April 20, 2020, and November 5, 2021, be filled consistent with the by-laws at Articles I, Sections 2, 7, and 8.

(e) Subsequent to corrective elections the BOT must properly notify newly elected stakeholder members of any meetings and votes in which they were illegally excluded since June, 2020;

(f) That Article 2, Section 7, which authorizes a quarter century sealing of records from interested parties, such as Alumni and the public, be deemed inconsistent with the University's non-profit legal status, DC Law, and common law regarding the exercise of the BOT's fiduciary duty; the court should specifically declare that this by-law provision impedes the ascertainment by interested parties, such as Howard University

Alumni, regarding the BOT's compliance with its statutory and common law fiduciary duties; and

(g) Such other equitable, declaratory, and other relief deemed necessary by this court, including legal fees.

**JURY TRIAL DEMANDED**

Respectfully submitted,

*/s/ Donald M. Temple*
Donald M. Temple #408749
1310 L Street, NW, Suite 750
Washington, D.C. 20005
Tel: (202) 628-1101
dtemplelaw@gmail.com

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2022, I caused the foregoing Amended Complaint to be served electronically upon:

TRUSTEES OF ITS BOARD OF TRUSTEES
AND THE HOWARD UNIVERSITY
BOARD OF TRUSTEES c/o
SECRETARY OF THE BOARD
2400 6TH ST. NW
WASHINGTON, DC  20059

*/s/Donald M. Temple*
Donald M. Temple, Esq.