**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TIMOTHY L. JENKINS, *et al.*, <br><br>　　　　　　　*Plaintiffs*, <br><br>　　v. <br><br>HOWARD UNIVERSITY, *et al.*, <br><br>　　　　　　　*Defendants*. | Civil Action No. 1:22-cv-00874 (RC) |

**OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE
TO FILE A SECOND AMENDED COMPLAINT**

**INTRODUCTION**

Having failed in their first two attempts to state an actionable claim, Plaintiffs seek to file yet another pleading—their third—requesting permission to hijack the governance of Howard University ("Howard" or the "University"). Specifically, Plaintiffs wish to arrogate to themselves powers that Congress vested exclusively in Howard's Board of Trustees (the "Board") and to dictate such matters as the content of Howard's bylaws and the structure of its Board. In a desperate attempt to avoid dismissal and to keep this lawsuit alive for ignoble purposes, Plaintiffs continue inventing claims that have no basis in law. This Court should deny Plaintiffs' Motion for Leave to file a Second Amended Complaint (the "Motion to Amend") and bring this costly, burdensome and harassing lawsuit to an end.

To begin, Plaintiffs' proposed amendment would be futile because Plaintiffs' proposed Second Amended Complaint (the "SAC") could not survive a motion to dismiss. Rather than curing the many defects in Plaintiffs original complaint and in the first Amended Complaint (the "FAC"), the SAC instead manufactures two entirely new and completely unsupported legal theories. After more than a year of litigation and years after the events in question, Plaintiffs claim to have now discovered that the District of Columbia's trust laws somehow control the internal corporate governance of Howard, a federally chartered corporation – a claim that lacks any supporting precedent and contradicts Howard's federal Charter. A sudden epiphany also leads Plaintiffs to now allege that they are third-party beneficiaries of previously unalleged "contracts" between Howard and its alumni; but there are no such enforceable contracts and, even if there were, Plaintiffs would have no power to enforce them.

More fundamentally, Plaintiffs' latest proposed amendment does not serve the interests of justice, undermines judicial economy and would prejudice Defendants. Plaintiffs already have amended their pleading once without success. They have been aware of the *facts* supposedly

underlying their proposed SAC for more than a year and could have raised their new legal theories at any point during that time period. They made the tactical election not to do so.  Instead, they waited until they faced a dispositive motion that could end this litigation before conjuring up unprecedented legal theories that stretch the limits of good faith advocacy.

This Court should not allow Plaintiffs to raise one untenable legal theory after another in the hope that eventually they will find something that sticks.  This ill-conceived litigation already has imposed upon Defendants and the court system unreasonable cost, time and burden.  Moreover, the continued existence of this litigation unnecessarily casts a cloud over the governance of the University by its duly elected Board of Trustees.  For the sake of the entire community of Howard students, employees, administrators and alumni, this litigation should be promptly dismissed without leave to file further amendments.

## PROCEDURAL BACKGROUND

On December 26, 2021, this litigation began with the filing of Plaintiffs' original complaint in the Superior Court of the District of Columbia.  ECF No. 1-2.  Two months later, after Defendants noted deficiencies in that pleading, Plaintiffs filed the FAC.  ECF No. 1-1.

On March 31, 2022, Defendants removed this litigation to this Court on the basis of federal question jurisdiction.  ECF No. 1.  Defendants then timely moved to dismiss the FAC on May 2, 2022.  ECF No. 7.  In violation of the local rules of this Court, Plaintiffs neither obtained an extension of their response time nor responded to Defendants' motion.  Instead, Plaintiffs moved to remand and filed a motion to stay that they treated as self-executing.  ECF No. 9.  In effect, Plaintiffs granted themselves an indefinite extension of time to answer Defendants' Motion to Dismiss.

Eventually, after this Court denied their Motion to Remand, Plaintiffs finally submitted a Memorandum of Law in Opposition to Defendants' Motion to Dismiss (the "Opposition").  ECF

No. 20. Plaintiffs also moved for leave to file the SAC, ECF No. 18, a proposed pleading that seeks to cure some of the defects in Plaintiffs' FAC (*e.g.*, it would remove Plaintiffs' request for declaratory relief as an independent free-standing count). More radically, the SAC also proposes to proceed on the basis of two entirely new legal theories: (1) Plaintiffs' assertion that the University is a District of Columbia charitable trust whose internal corporate governance is controlled by the District of Columbia's trust laws; and (2) Plaintiffs claim that they can enforce (whether as third-party beneficiaries or otherwise) supposed contracts between the University and its alumni. Neither theory can withstand even passing scrutiny.

## **GOVERNING STANDARDS**

The standards governing a motion to amend are well-established. The decision to grant or deny leave to amend is committed to the sound discretion of the District Court. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Stone v. U.S. Dep't of State,* No. 21-CV-3244, 2022 WL 4534732, at *4 (D.D.C. Sept. 28, 2022). Leave may be denied due to "undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." *Araya v. Kessler*, 78 F. Supp. 3d 452, 457 (D.D.C. 2015), *aff'd*, No. 15-CV-7021, 2015 WL 5210518 (D.C. Cir. Aug. 12, 2015) (quoting *Richardson v. United States*, 193 F. 3d 545, 548-49 (D.C. Cir. 1999)). "Of particular relevance here, '[c]ourts will properly deny a motion to amend when it appears that the plaintiff is using Rule 15 to make the complaint a moving target, to salvage a lost case by untimely suggestion of new theories of recovery, [or] to present theories seriatim in an effort to avoid dismissal.'" *Sai v. TSA*, 326 F.R.D. 31, 34 (D.D.C. 2018) (*quoting Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 133-34 (D.D.C. 2013)).

As explained below, Plaintiffs fall far short of demonstrating that the Court should exercise its discretion and grant them leave to amend their complaint for a second time. It would be futile

for Plaintiffs to file the SAC because that pleading cannot survive a motion to dismiss.[1]  Moreover, it would severely prejudice Defendants to have this abusive litigation continue and for Plaintiffs to continue casting a legal cloud over the internal governance of Howard.

## ARGUMENT

### I.   Amendment Would be Futile

This Court should deny Plaintiffs' leave to amend because doing so would be futile.  *James Madison Ltd. by Hecht v. Ludwig*, 82 F. 3d 1085, 1099 (D.C. Cir. 1996).  "An amended complaint is futile 'if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the Court previously ruled, fails to state a legal theory or could not withstand a motion to dismiss.'" *Onyewuchi v. Gonzalez*, 267 F.R.D. 417, 420 (D.D.C. 2010) (quoting *Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 114 (D.D.C. 2002)); *see also Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1003 (D.C. Cir. 1996) (affirming the district courts' denial of leave to amend when there was "little chance" the plaintiff would succeed on his claim).

Here, Plaintiff proposed SAC could not survive a motion to dismiss.  Plaintiffs' proposed new pleading does not cure the defects in the original FAC and their two new legal theories not only stand "little chance" of success, but utterly fail as a matter of law.

#### A. The SAC does not cure the Deficiencies of the FAC.

As explained in Defendants' Opening Memorandum and Reply Memorandum in Support of their Motion to Dismiss (the "Reply Memorandum"), the FAC fails to state a cognizable claim for a multitude of reasons, many of which remain wholly unaddressed by Plaintiffs.  Most obviously, as discussed at pages 14-20 of Defendants' Opening Memorandum and at pages 4-8 of their Reply Memorandum, both of which are incorporated herein by reference, Plaintiffs have not

---

[1]   Defendants will set forth the defects of the SAC in greater detail if and when the Court allows that document to be filed and Defendants submit their required response pursuant to Fed. R. Civ. P. 15(a)(3).

identified any action by the Board that violates either the University's Charter or Bylaws. *See* ECF No. 7-1 at 14-20. Much less have Plaintiffs' identified any conduct that could support a claim of breach of fiduciary duty by the members of the Board. *See id.* at 27-30. And even if they had articulated an actionable wrong, Plaintiffs have alleged no facts that provide colorable grounds for Plaintiffs to enforce compliance with Howard's governance documents. *See id.* at 21-25. Thus, to the extent the SAC continues to assert claims previously raised in the FAC (such as Plaintiffs various theories as to why the Board's conduct supposedly violated various provisions of the University's Bylaws), those claims fail as a matter of law and could not survive a motion to dismiss.

### B. Howard was formed as a federally chartered corporation, not as a District of Columbia Trust.

#### 1. Congress did not intend to create the University as a Trust

Plaintiffs' proposed SAC centers on a newly-invented claim alleging that the University actually is a charitable trust governed by District of Columbia trust law – specifically, the District of Columbia Universal Trust Code (the "DCUTC"). Plaintiffs argue that, "Howard University and its trustees, by way of its 1867 Charter, enjoy a trust relationship with the United States Congress." ECF No. 18 at 4; *see also* SAC ¶¶ 15-19. Plaintiffs then leap to the surprising conclusions that "although [Howard] must follow provisions of a number of federal laws, it is nonetheless to act as a trustee under District of Columbia law" and that, "[a]s a Trust, Defendants' actions are governed by the [DCUTC], to which the University, as a Trust, could not opt out." *Id.* at 5; *see also* SAC ¶ 19 ("In establishing the University, Congress intended its incorporators to establish a trust to hold and operate the university. As a Trust, the University is governed by the D.C. Uniform Trust Code."). In other words, Plaintiffs seek to transform an institution that has acted as a federally chartered corporation for its entire 150 year-plus history into an entirely different legal entity (a

6

trust) whose internal corporate governance is controlled by the trust laws of an entirely different sovereign (the District of Columbia). *See* SAC ¶¶ 112-23 (Count II alleging that members of the Board violated the DCUTC). This legal alchemy fails on its face. [2]

To begin, Plaintiffs ask the Court to overlook that Congress made the specific affirmative decision to form Howard University as a corporation, and not as a trust. *See*, *e.g.*, 14 Stat. 438 § 2 (declaring that the University would be "a body politic and *corporate*") (emphasis added). Indeed, the Charter repeatedly refers to the University as a corporation. *See id.* § 3 (the "corporators . . . may enact by-laws not inconsistent with the laws of the United States regulating the government of the corporation"); *id.* § 4 (trustees have the power "heretofore granted to the corporation"); *id.* § 9 ("That no misnomer of the said corporation shall defeat or annul any donation, gift, grant, devise or bequest to or from the said corporation."); *id.* § 10 ("said corporation shall not employ its funds"). Significantly, Congress also made clear that the University had the power to sue and be sued in its own name (*id*. § 2) – a basic feature of a corporation but something a trust could not do at the time the Charter was issued. *See*, *e.g.*, 88 A.L.R. 775 (1978) ("[A]t common law a trust could not ordinarily sue in its own name but only by its trustees.").

By contrast, nothing in the Charter suggests Congressional intent to create Howard as a trust. Much less is there any hint that Congress intended the University's internal governance to be controlled by trust law rather than ordinary corporate and contract law. And certainly there is not the slightest suggestion in the language of the University's federal Charter reflecting that

---

[2] In fact, Plaintiffs' argument is internally inconsistent. They argue both that the University is the trustee of a trust created by Congress and that it is the trust itself. ECF No. 18 at 5. Plaintiffs also evidence uncertainty over whether the University actually is a trust governed by the DCUTC. *See* ECF No. 20 at 3 (stating Congress "effectively" formed the university as a trust.); *id.* at 5 (Plaintiffs' claims are "potentially" subject to DCUTC); *id.* at 6 ("Should D.C. law apply, the following law would govern the immediate dispute . . ."). Plaintiffs' confusion and uncertainty regarding their own trust theory demonstrates its lack of plausibility.

Congress intended the trust laws *of the District of Columbia* to control Howard's internal corporate governance.[3]

Indeed, courts have long refused to treat directors of charitable corporations as having duties akin to those of trustees. *See*, *e.g.*, *Commonwealth by Kane v. New Founds., Inc.*, 182 A. 3d 1059, 1074 (Pa. Comm. Ct. 2018) ("What this means is that a director of a nonprofit [] corporation does not have the equivalent obligation of a trustee but the director, when exercising his or her fiduciary duties, must take into consideration what is 'in the best interest' of the corporation."); *see also Stern v. Lucy Webb Hayes Nat. Train. Sch. for Deacon. & M.*, 381 F. Supp. 1003, 1013 (D.D.C. 1974) ("[T]he modern trend is to apply corporate rather than trust principles in determining the liability of the directors of charitable corporations, because their functions are virtually indistinguishable from those of their 'pure' corporate counterparts."). Much less have courts deemed charitable corporations to actually constitute trusts for purposes of internal corporate governance matters such as board structure.

Plaintiffs cite *Depu v. Oath Holdings, Inc.*, No. 17-CV-635, 2022 WL 1500542 (D.D.C. May 5, 2022) as a case supposedly supporting their legal claim that Howard is a trust subject to the DUTC. ECF No. 18 at 4. But that decision is unremarkable and unhelpful to Plaintiffs. In *Depu*, settlement of litigation against Yahoo, Inc. resulted in the creation of a "Human Rights Fund" that would be administered by Laogoi Research Foundation (the "Foundation"), a Virginia nonprofit dedicated to educating the public about the Chinese prison system. *Id*. at * 1. This Court ultimately concluded that the settlement *fund* was a charitable trust governed by District of

---

[3]  Although it is not clear from their pleading, Plaintiffs may also be trying to imply that the use of the word "intrusted" in Howard's Charter somehow evidences an intent to create a charitable trust. SAC ¶ 22 (noting that governance of each department is "'intrusted' to their respective faculties"). But "intrust" is simply an archaic British spelling of the word "entrust." It is not the same thing as saying that assets (or departmental governance) were placed "in trust" and the term "intrust" has nothing whatsoever to do with the formation of a legal trust.

8

Columbia law and that the Foundation was one of the trustees of that trust. *Id*. at * 23. But this Court's analysis focused entirely on the settlement *fund*, not on the *Foundation*. Nowhere does the Court hold that the characterization of settlement funds as a trust somehow transformed the Foundation itself, a Virginia nonprofit, into a District of Columbia charitable trust. Nor did this Court (or any of the parties for that matter) suggest that the District of Columbia had any authority to regulate the internal affairs of that Virginia nonprofit even if it was a trustee of a trust governed by the laws of the District of Columbia. Rather, *Depu* merely recognizes the principles that funds specifically designated for the benefit of another can create a trust relationship and that a nonprofit entity can serve as a trustee of such a trust. Neither principle supports Plaintiffs' arguments in this case.

**2. There is no basis for applying District of Columbia Trust Law to the University.**

Plaintiffs' trust argument also faces another glaring problem: Even if Congress had intended to create the University itself as a trust, there is nothing in Howard's Charter to suggest Congress intended the District of Columbia's trust laws to govern the internal affairs of that federally chartered entity.

In an effort to address this failing, Plaintiffs assert that a 1928 amendment to the University's Charter somehow had the effect of "reincorporating" Howard as a District of Columbia corporation. ECF No. 20 at 5-6. Plaintiffs make this claim despite that nothing in the amendment (which addressed only federal funding of the University) makes the slightest reference to reincorporation or suggests that Howard's governance changed in any way. Instead, Plaintiffs seem to argue that because the District of Columbia had the power to issue corporate charters in 1928, any amendment of Howard's Charter at that time automatically and silently effected a magical act of reincorporation of the University into the District of Columbia. *Id.* Of course, Plaintiffs cite absolutely no legal authority for this fanciful legal theory. Moreover,

9

Plaintiffs ignore that regardless of whether the District of Columbia had the power to issue corporate charters in 1928, no such Charter ever was issued by the District of Columbia to the University. Plaintiffs do not and cannot allege otherwise. Plaintiffs' "reincorporation" theory is therefore dead on arrival.

Doubling down on their effort to subject the University to the District of Columbia's nonprofit laws, Plaintiffs also argue that the University theoretically might not have authorized one of its officers to send a letter confirming that the University had not opted into the District's nonprofit act (Chapter 29 of the D.C. Code). *See id.* at 6 (arguing that unless a board resolution authorized University to opt out of the statute, that "election" is "arguably insufficient"). But, presumably mindful of Fed. R. Civ. P. 11, Plaintiffs never actually allege that any University official ever acted without authority; they only speculate that it *could* be possible. Of course, such speculation cannot enable plaintiffs to survive a motion to dismiss. *See Henok v. Kessler*, 78 F. Supp. 3d. 452, 458 (D.D.C. 2015) ("Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions"). In any event, even if there was any factual basis for Plaintiffs' rank speculation (there is not), it would be of no moment. As this Court previously noted, the statute requires affirmative action to opt-in, not affirmative action to opt-out. *See* Mem. Op. Denying Pls' Mot. to Remand at 10, ECF No. 16 ("But as Defendants point out, Chapter 29 only applies to nonprofits established in the District of Columbia by Act of Congress that affirmatively opt in – something Howard did not do."). Because nothing in the proposed SAC alleges that the University ever took any action, whether authorized or not, to opt-in to the statute there is no plausible basis for the application of Chapter 29.

In short, Plaintiffs' argument for the application of D.C. law fails both because Howard never "reincorporated" into the District of Columbia and because it never took any affirmative steps to opt-in to the D.C. nonprofit act. The SAC alleges no facts indicating otherwise.

Moreover, while Plaintiffs' trust argument fails on its own terms, it is also worth noting that accepting Plaintiffs' argument would lead to absurd results and would violate fundamental Constitutional and conflict-of-laws principles. For example, under Plaintiffs' logic, virtually every nonprofit charitable corporation incorporated by the federal government or by another state but operating in the District (like the Foundation in *Depu*, for example) would be at risk of being deemed a charitable trust whose internal affairs are subject to District of Columbia law. But Plaintiffs cite not a single case where a court has reached this conclusion with respect to such an entity. Given the large number of foreign and federal nonprofit organizations operating within the District, this can hardly be coincidental. Indeed, Plaintiffs' argument would essentially jettison the internal affairs doctrine for foreign and federal charitable corporations operating within the District, a result that cannot be reconciled with precedent of the United States Supreme Court. *See*, *e.g.*, *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) (applying the internal affairs doctrine). Elevating District of Columbia trust law over federal law (Howard's Charter) also would violate the Supremacy Clause of the U.S. Constitution.

In sum, Plaintiffs' resort to trust law should be recognized for what it is – a desperate but unsuccessful attempt to find a new legal theory that can get them beyond a motion to dismiss. Because all of Plaintiffs' claims in the SAC ultimately depend upon the application of the District of Columbia's nonprofit and trust laws, and because those laws do not apply to Howard, the SAC alleges only futile claims and Plaintiffs' Motion to Amend should be denied.

### 3. Even if the DCUTC somehow applied to Howard's internal Governance, Plaintiffs proposed claims fail.

As explained above, nothing in Howard's Charter suggests Congress intended the foundation of Howard to create Howard itself as a trust. The DCUTC therefore would not apply by its own terms. *See* D.C. Code § 19-1304.09 (formation of trust requires that settlor indicate an intention to create that trust).

Even if the DCUTC did apply, Plaintiffs would have no standing to pursue claims under that statute. Plaintiffs rely heavily upon *Hooker v. Edes Home*, 579 A. 2d 608 (D.C. Cir. 1990) to argue that they have a "special interest" that enables them to bring a claim under the DCUTC. ECF No. 20 at 8-9. Unlike *Hooker*, however, Plaintiffs cannot claim to represent a class of beneficiaries with a "special interest" in the outcome of this litigation. This action was brought not as a class action, but solely on behalf of the individual Plaintiffs. Indeed, Plaintiffs could not bring this action as a class action because they cannot pretend to represent the interests of all of the University's alumni. *See* SAC § Parties n. 1 (acknowledging the Howard university Alumni Association "might appear to be the vehicle through which to bring the immediate lawsuit"). Far from representing a class with a "special interest" in this litigation, Plaintiffs' lawsuit is actually contrary to the wishes and interest of many of the University's more than 100,000 living alumni.

But more fundamentally, Plaintiffs completely ignore that *Hooker* established *two separate* prerequisites for a private party to bring an action under the DCUTC. As explained by the United States Circuit Court for the District of Columbia:

> *Hooker* established two requirements for "special interest" standing: (1) that the action challenge an "extraordinary measure threatening the existence of the trust," not just an "ordinary exercise of discretion" committed to the trustees; and (2) that the plaintiffs belong to a class of potential beneficiaries that is "sharply defined" and "limited in number."

12

*Depu v. Yahoo, Inc.*, 950 F. 3d 897, 906 (D.C. Cir. 2020) (quoting *Hooker*, 579 A.2d at 609, 614-15).

Plaintiffs understandably make no attempt to argue that this lawsuit somehow challenges "extraordinary measures threatening the existence of" the University. There is no claim that the University's assets are at risk, that its license to operate is about to be revoked or that any other catastrophic event is in the offing.[4] Rather, despite a unanimous vote by The Board to alter its own internal structure, Plaintiffs are subjectively disappointed that elections to the Board are no longer handled in the manner they individually wish. But Board elections are a perfect example of a discretionary area committed to Howard's Board Trustees by Howard's Charter. The DCUTC provides no grounds for Plaintiffs to intrude into this domain of ordinary governance.[5]

### C. Plaintiffs' Third-Party Beneficiary Theory fails as a matter of law.

Plaintiffs also now argue that they can salvage their claims by relying on contract law, including third-party beneficiary law. *See* SAC ¶ 11. This argument proceeds in several steps:

- Step 1: Plaintiffs allege that "[i]n 1923-24, Howard Alumni, pursuant to alumni campaign and pressure, entered into an agreement with Defendant University to allow alumni to nominate alumni members." *Id.* ¶¶ 33, 108.

- Step 2: "[Howard's] subsequent Bylaw amendment in 1925-26 authorizing alumni to elect three alumni to the Board constituted an additional contract between the Alumni and the Board." *Id.* ¶ 52.

- Step 3: Plaintiffs argue that they may enforce each of these contracts either directly or as third-party beneficiaries. *Id.* ¶¶ 106-11.

Each and every step of this analysis fails.

---

[4] Nor can plaintiffs plausibly allege any such forthcoming catastrophe. *See Fitch Ratings, Fitch Upgrades Howard University (DC) to BBB; Outlook Stable* (Feb. 16, 2023), https://www.fitchratings.com/research/us-public-finance/fitch-upgrades-howard-university-dc-to-bbb-outlook-stable-16-02-2023.

[5] As Defendants noted in the Opening Memorandum, a seated Alumni trustee was part of the unanimous Board that approved the bylaw amendments and the Board recently committed to have 50% of the Board be comprised of Howard alumni. ECF 7-1 at 7.

### 1. The 1923-24 appointment of Trustees did not create an enforceable contract with alumni.

Plaintiffs' have not alleged the existence of a valid contract with respect to the 1923-24 appointment of Trustees. "To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation of duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting *Tsintolas Realty Co. Mendez*, 984 A. 2d 181, 187 (D.C. Cir. 2009)). Although the relationship between a university and its students can be contractual in nature . . . a plaintiff must nevertheless allege sufficient facts to demonstrate . . . the terms of the contract." *Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 98 (D.D.C. 2012) (internal quotation marks and citation omitted). Plaintiffs do not adequately allege any such contract.

Plaintiffs argue that a contract was formed because, "[i]n 1923-24, Howard alumni, pursuant to alumni campaign and pressure, entered into an agreement with Defendant University to allow alumni to nominate alumni members." ECF No. 18 at 4; SAC ¶ 33. For an enforceable contract to be formed, however, the parties must "(1) express an intent to be bound, (2) agree to all material terms, and (3) assume mutual obligation." *Dyer v. Bilaal*, 983 A. 2d 349, 356 (D.C. Cir. 2009). The alleged obligations that underlies the claim "must be so definite in its terms . . . that the promises and performances to be rendered by each party are reasonably certain." *Basch v. George Washington Univ.,* 370 A. 2d 1364, 1367 (D.C. Cir. 1977). More particularly, when dealing with educational institutions, a plaintiff must plausibly allege a university's intent to be bound by a particular statement creating such an obligation. *Id.*; *see also Shinabargar v. Bd. Of Trustees of Univ. of District of Columbia,* 164 F. Supp. 3d 1, 29 (D.D.C. 2016).

14

Plaintiffs cannot, and the SAC does not, satisfy these requirements with respect to the alleged 1923-24 contract. Nowhere do Plaintiffs identify any writing memorializing this supposed contract. Nor do they anywhere describe its material terms (scope, duration, consideration, etc.). And certainly, Plaintiffs allege no facts indicating that the University expressed an intent to be eternally bound by this governance arrangement. Given their inability to allege any of such facts, Plaintiffs cannot rely upon a supposed 1924-25 contract to pursue either a direct or a third-party beneficiary claim. Plaintiffs' purported discovery of a contract that nobody else recognized for almost a century provides no basis for this litigation to proceed.

### 2. The University subsequent bylaw amendments did not create a contract with alumni.

Plaintiffs also allege in the proposed SAC that "[Howard's] subsequent Bylaw amendment in 1925-26 authorizing alumni to elect three alumni to the Board constituted an additional contract between the Alumni and the Board." SAC ¶ 52. Again, however, Plaintiffs have alleged no facts indicating that the University expressed an intent to perpetually bind itself to a permanent governance structure by a simple bylaw amendment. Given the absence of any such allegations of fact, there can be no such contract. The University's Charter vested the Board with exclusive authority over the content of the University's Bylaws. The University's own Charter therefore would not enable the Board to enter into a "contract" that prevented it from amending the Bylaws if the Board determined in the future such a course was in the best interests of the University.

### 3. Plaintiffs have no right to enforce either of the purported contracts.

Even assuming *arguendo* the existence of a contract between the University and its students, or even its alumni, Plaintiffs have not alleged any facts showing that the contracting parties intended for them, as individuals, to be able to enforce it. They therefore could not proceed on either a direct or a third-party beneficiary claim even if an enforceable contract existed.

An analogous situation arose in *Brooks v. Tr. of Dartmouth Coll.*, 20 A 3d 890 (N.H. 2011). In that case, college alumni and members of an alumni association sued college trustees for, among other things, allegedly breaching an alleged contractual agreement to maintain parity between alumni-nominated trustees and board-nominated trustees. *Id.* at 893. Affirming the trial court's grant of summary judgment, the New Hampshire Supreme Court found plaintiffs had no basis to assert claims as purported third-party beneficiaries of this alleged contract. The court explained that plaintiffs failed to show that the alleged contract (assuming arguendo it even existed) evidenced an intent to directly benefit plaintiffs as third-party beneficiaries, or that the original parties considered plaintiffs' legal status and intended to confer upon plaintiffs a right to sue under the contract. *Id.* at 901.

So here. Plaintiffs do not and cannot allege that the University (or Congress, or anyone else for that matter) intended to confer upon individual alumni a right to sue over the internal governance of the institution. Indeed, Plaintiffs do not explain how the University could have made such an agreement even had it wished to do so. The University's Charter constitutes federal law and, in that federal law, Congress vested authority over the University's internal corporate governance solely with the Board. The University could not simply contract away that exclusive right and obligation without the consent of Congress.

Finally, while the SAC speaks in terms of a contract between the University and alumni, the SAC and Plaintiffs' Motion to Amend also sometimes speaks of a contract between the University and the United States. *See* ECF No. 18 at 4. To the extent this is a basis of Plaintiffs' claim, the SAC alleges nothing to suggest Congress intended to grant Plaintiffs a private right of action to enforce the Charter. And as Defendants noted in their Opening Memorandum, the University's Charter is a federal law that cannot be enforced by those it purports to benefit. *See* ECF No. 7-1 at 24. *C.f. Astra USA, Inc. v. Santa Clara Cty., Cal.*, 563 U.S. 110, 118 (2011)

(holding that third-party beneficiaries of government contract could not sue to enforce statutory terms repeated in the contract.).

## II.     Amendment would not serve the Interests of Justice

This Court may deny a motion to amend "if a party had sufficient opportunity to state the amended claims and failed to do so." *Onyewuchi*, 267 F.R.D. at 420 (quoting *Equity Group, Ltd. v. Painewebber Inc.*, 839 F. Supp. 930, 932 (D.D.C. 1993)).  Here, Plaintiffs have been aware of the operative facts underlying their pleading for over a year.  They could have alleged the legal theories set forth in the SAC at any time.  Instead, they waited until faced with the need to respond to a dispositive motion before scrambling to invent unprecedented and illogical claims intended to salvage their case.  Two bites at the apple is enough.

Plaintiffs have forced Defendants to shoot at a "moving target" by the "untimely suggestion of new theories of recovery" and by presenting those theories "seriatim in an effort to avoid dismissal."  *Sai*, 326 F.R.D. at 34.  This cynical approach to litigation has resulted in needless expense and burden.

More importantly, Plaintiffs' actions have prejudiced, and continue to prejudice, the University, its Board, and its present students and alumni.  From the beginning, this lawsuit has operated as one piece of a coordinated publicity campaign intended to pressure the University into adopting a governance structure the Board does not believe serves the best interest of the University.  It also is clear that Plaintiffs wish to use this litigation to obtain access to the University's extremely sensitive and confidential documents.  But even lawsuits intended for publicity and discovery purposes have real-world consequences.  Plaintiffs' claims have cast a cloud over the University by calling into question who its trustees are and whether actions taken in the past years were validly authorized.  Allowing Plaintiffs to continue rolling out new legal theories will only prolong this harm.

## **CONCLUSION**

For all of the forgoing reasons, Plaintiffs' Motion to Amend should be denied in its entirety.

March 13, 2023                                      Respectfully submitted,

*/s/ Lillian S. Hardy*          .
Lillian S. Hardy
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5884
Facsimile: (202) 637-5910
lillian.hardy@hoganlovells.com

## **CERTIFICATE OF SERVICE**

I, Lillian S. Hardy, hereby certify that on March 13, 2023, I caused a true and correct copy of Defendants' Opposition to Plaintiffs' Motion for Leave to File Second Amended Complaint to be electronically filed with the Clerk of the Court using CM/ECF and effected service on all counsel of record via the CM/ECF system, pursuant to Local Civil Rule 5.4(d).

March 13, 2023

    /s/ Lillian S. Hardy
Lillian S. Hardy